LO–JI SALES, INC. *v.* NEW YORK

No. 78–511.   Argued April 16, 1979—Decided June 11, 1979

Burger, C. J., delivered the opinion for a unanimous Court.

*Bernard A. Berkman* argued the cause and filed briefs for petitioner.

*Richard L. Parker* argued the cause for respondent. With him on the brief was *David S. Ritter.**

*\*Michael A. Bamberger* filed a brief for the American Booksellers Association, Inc., et al. as *amici curiae* urging reversal.

*Charles H. Keating, Jr., pro se, Richard M. Bertsch,* and *James J.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari on claims that the seizure of magazines, films, and other objects from petitioner's bookstore violated guarantees of the First, Fourth, and Fourteenth Amendments. 439 U. S. 978 (1978).

## I

On June 20, 1976, an investigator for the New York State Police purchased two reels of film from petitioner's so-called "adult" bookstore. Upon viewing them, he concluded the films violated New York's obscenity laws. On June 25, he took them to a Town Justice for a determination whether there was reasonable cause to believe the films violated the state obscenity laws so as to justify a warrant to search the seller's store. The Town Justice viewed both films in their entirety, and he apparently concluded they were obscene. Based upon an affidavit of the investigator subscribed before the Town Justice after this viewing, a warrant issued authorizing the search of petitioner's store and the seizure of other copies of the two films exhibited to the Town Justice.

The investigator's affidavit also contained an assertion that "similar" films and printed matter portraying similar activities could be found on the premises, and a statement of the affiant's belief that the items were possessed in violation of the obscenity laws. The warrant application requested that the Town Justice accompany the investigator to petitioner's store for the execution of the search warrant. The stated purpose was to allow the Town Justice to determine independently if any other items at the store were possessed in violation of law and subject to seizure. The Town Justice agreed. Accordingly, the warrant also contained a recital that authorized the seizure of "[t]he following items that the Court

Clancy filed a brief for Charles H. Keating, Jr., as amicus curiae urging affirmance.

independently [on examination] has determined to be possessed in violation of Article 235 of the Penal Law . . . ."[1] However, at the time the Town Justice signed the warrant there were no items listed or described following this statement. As noted earlier, the only "things to be seized" that were described in the warrant were copies of the two films the state investigator had purchased. Before going to the store, the Town Justice also signed a warrant for the arrest of the clerk who operated the store for having sold the two films to the investigator.

The Town Justice and the investigator enlisted three other State Police investigators, three uniformed State Police officers, and three members of the local prosecutor's office—a total of 11—and the search party converged on the bookstore. The store clerk was immediately placed under arrest and advised of the search warrant. He was the only employee present; he was free to continue working in the store to the extent the search permitted, and the store remained open to the public while the party conducted its search mission which was to last nearly six hours.

The search began in an area of the store which contained booths in which silent films were shown by coin-operated projectors. The clerk adjusted the machines so that the films could be viewed by the Town Justice without coins; it is disputed whether he volunteered or did so under compulsion of the arrest or the warrant. See *infra*, at 329. The Town Justice viewed 23 films for two to three minutes each and, satisfied there was probable cause to believe they were obscene, then ordered the films and the projectors seized.

The Town Justice next focused on another area containing four coin-operated projectors showing both soundless and sound films. After viewing each film for two to five minutes,

---

[1] New York Penal Law § 235.00 (McKinney Supp. 1978–1979) is the definitional section of the State's obscenity law. Petitioner was later charged with obscenity in the second degree, § 235.05. See n. 3, *infra*.

again without paying, he ordered them seized along with their projectors.

The search party then moved to an area in which books and magazines were on display. The magazines were encased in clear plastic or cellophane wrappers which the Town Justice had two police officers remove prior to his examination of the books. Choosing only magazines that did not contain significant amounts of written material, he spent not less than 10 seconds nor more than a minute looking through each one. When he was satisfied that probable cause existed, he immediately ordered the copy which he had reviewed, along with other copies of the same or "similar" magazines, seized. An investigator wrote down the titles of the items seized. All told, 397 magazines were taken.

The final area searched was one in which petitioner displayed films and other items for sale behind a glass enclosed case. When it was announced that each box of film would be opened, the clerk advised that a picture on the outside of the box was representative of what the film showed. Therefore, if satisfied from the picture that there was probable cause to believe the film in the box was obscene, the Town Justice ordered the seizure of all copies of that film. As with the magazines, an investigator wrote down the titles of the films seized, a total of 431 reels.[2] Miscellaneous other items, including business records, were also seized, but no issue concerning them is raised here.

Throughout the day, two or three marked police cars were parked in front of the store and persons who entered the store were asked to show identification and their names were taken by the police. Not surprisingly, no sales were made during the period the search party was at the store, and no customers or potential customers remained in the store for any appreciable time after becoming aware of the police presence.

---

[2] The State's brief asserts approximately 474 films were taken, but from the inventory filed in the case it appears the number was 431.

After the search and seizure was completed, the seized items were taken to a State Police barracks where they were inventoried. Each item was then listed on the search warrant, and late the same night the completed warrant was given to the Town Justice. The warrant, which had consisted of 2 pages when he signed it before the search, by late in the day contained 16 pages. It is clear, therefore, that the particular description of "things to be seized" was entered in the document after the seizure and impoundment of the books and other articles.

The items seized formed the basis for a three-count information charging petitioner with obscenity in the second degree under New York law.[3] The counts were based upon the three main groups of items seized: the magazines, Count I; the films for sale to the public, Count II; and the films and coin-operated projectors, Count III. Before trial, petitioner moved to suppress all the evidence upon which the three counts were based because it had been searched for and seized in violation of the First, Fourth, and Fourteenth Amendments. The motion was denied. Petitioner then entered a guilty plea to all three counts and was fined $1,000 on each. Accordingly, the obscenity of the magazines and films having been the subject of a judicial confession, there is no issue of obscenity in the case.[4] Only the validity of the warrant and the search and seizure of the property are before us.

---

[3] New York Penal Law § 235.05 (McKinney Supp. 1978–1979) defines obscenity in the second degree as follows:

"A person is guilty of obscenity in the second degree when, knowing its content and character, he:

"1. Promotes, or possesses with intent to promote, any obscene material . . . ."

Section 235.00 of the Penal Law states:

"4. 'Promote' means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer or agree to do the same."

[4] The clerk arrested at petitioner's store entered a guilty plea to a

New York permits appeal of a denial of a motion to suppress even after a plea of guilty to the charge. N. Y. Crim. Proc. Law § 710.70 (2) (McKinney 1971). Pursuant to this procedure, petitioner appealed and the intermediate appellate court for that judicial district affirmed the convictions. A timely application for leave to appeal to the New York Court of Appeals was denied.

## II

This search warrant and what followed the entry on petitioner's premises are reminiscent of the general warrant or writ of assistance of the 18th century against which the Fourth Amendment was intended to protect. See *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 311 (1978); *Stanford* v. *Texas,* 379 U. S. 476, 481 (1965); *Marcus* v. *Search Warrant,* 367 U. S. 717, 724 (1961). Except for the specification of copies of the two films previously purchased, the warrant did not purport to "particularly describ[e] . . . the . . . things to be seized." U. S. Const., Amdt. 4. Based on the conclusory statement of the police investigator that other similarly obscene materials would be found at the store, the warrant left it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure. The Fourth Amendment does not permit such action. *Roaden* v. *Kentucky,* 413 U. S. 496, 502 (1973); *Stanford* v. *Texas, supra,* at 485; *Marcus* v. *Search Warrant, supra,* at 732. Nor does the Fourth Amendment countenance open-ended warrants, to be completed while a search is being conducted and items seized or after the seizure has been carried out.

This search began when the local justice and his party entered the premises. But at that time there was not sufficient probable cause to pursue a search beyond looking for additional copies of the two specified films, assuming the validity of searching even for those. And the record is clear

charge of disorderly conduct for selling the two films to the State Police investigator. He did not appeal.

that the search began and progressed pursuant to the sweeping open-ended authorization in the warrant. It was not limited at the outset as a search for other copies of the two "sample" films; it expanded into a more extensive search because other items were found that the local justice deemed illegal. Therefore, we have no occasion to decide whether in this context the "plain view" doctrine might be applicable. See *Coolidge* v. *New Hampshire,* 403 U. S. 443, 465 (1971).[5] Nor can it reasonably be argued that the search was incident to arrest of the store clerk. *Chimel* v. *California,* 395 U. S. 752 (1969).

## III

We have repeatedly said that a warrant authorized by a neutral and detached judicial officer is "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson* v. *United States,* 333 U. S. 10, 14 (1948)." *United States* v. *Chadwick,* 433 U. S. 1, 9 (1977). See also *Coolidge* v. *New Hampshire, supra,* at 450. The State contends that the presence and participation of the Town Justice in the search ensured that no items would be seized absent probable cause to believe they were obscene, and that his presence enabled petitioner to enjoy an immediate adversary hearing on the issue.

The Town Justice did not manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure. *Coolidge* v. *New Hampshire, supra,* at 449. We need not question the

---

[5] Of course, contraband may be seized without a warrant under the "plain view" doctrine. See, *e. g., Ker* v. *California,* 374 U. S. 23, 42–43 (1963). But we have recognized special constraints upon searches for and seizures of material arguably protected by the First Amendment, *e. g., Heller* v. *New York,* 413 U. S. 483 (1973); *Marcus* v. *Search Warrant,* 367 U. S. 717, 731–732 (1961); materials normally may not be seized on the basis of alleged obscenity without a warrant.

subjective belief of the Town Justice in the propriety of his actions, but the objective facts of record manifest an erosion of whatever neutral and detached posture existed at the outset. He allowed himself to become a member, if not the leader, of the search party which was essentially a police operation. Once in the store, he conducted a generalized search under authority of an invalid warrant; he was not acting as a judicial officer but as an adjunct law enforcement officer. When he ordered an item seized because he believed it was obscene, he instructed the police officers to seize all "similar" items as well, leaving determination of what was "similar" to the officer's discretion. Indeed, he yielded to the State Police even the completion of the general provision of the warrant. Though it would not have validated the warrant in any event, the Town Justice admitted at the hearing to suppress evidence that he could not verify that the inventory prepared by the police and presented to him late that evening accurately reflected what he had ordered seized.

We also cannot accept the State's contention that it acted in compliance with *Heller* v. *New York,* 413 U. S. 483 (1973). There, based on police reports of probable violation of state law, a judge viewed a film in a theater as an ordinary paying patron; on the basis of his observation of the entire performance, he then issued a warrant for the seizure of the particular viewed film as evidence. There was no claim that seizure of the single copy impeded the exhibitor's continued business pending decision on the issue of obscenity. Heller's claim was that not even one of his films could be lawfully seized without a prior adversary hearing. We rejected that claim and held that seizure on the warrant so issued by a neutral judicial officer on probable cause after viewing one film was constitutionally permissible so long as, on request, a prompt adversary hearing was available on the issue of obscenity. "With such safeguards, we do not perceive that an adversary hearing *prior* to a seizure [of a single sample film] by lawful

warrant would materially increase First Amendment protection." *Id.*, at 493. We also took pains to point out:

"Courts will scrutinize any large-scale seizure of books, films, or other materials presumptively protected under the First Amendment to be certain that the requirements of *A Quantity of Books* ·[v. *Kansas*, 378 U. S. 205 (1964),] and *Marcus* [v. *Search Warrant*, 367 U. S. 717 (1961),] are fully met. . . .

"But seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding, particularly where, as here, there is no showing or pretrial claim that the seizure of the copy prevented continuing exhibition of the film." *Id.*, at 491–492.

In contrast, the local justice here undertook to telescope the processes of the application for a warrant, the issuance of the warrant, and its execution. It is difficult to discern when he was acting as a "neutral and detached" judicial officer and when he was one with the police and prosecutors in the executive seizure, and indeed even whether he thought he was conducting, *ex parte*, the "prompt" postseizure hearings on obscenity called for by *Heller, supra*, at 492. *Heller* does not permit the kind of activities revealed by this record.[6]

IV

Perhaps anticipating our disposition of the case, the State

---

[6] We do not suggest, of course, that a "neutral and detached magistrate," *Shadwick* v. *Tampa*, 407 U. S. 345, 350 (1972), loses his character as such merely because he leaves his regular office in order to make himself readily available to law enforcement officers who may wish to seek the issuance of warants by him. For example, in *Heller*, the judge signed the search warrant for the seizure of the film in the theater itself. But as we have just pointed out, *Heller* cannot control this case where the local Town Justice undertook not merely to issue a warrant, but to participate with the police and prosecutors in its execution.

raises a different theory from the one advanced in its opposition to the petition for certiorari and on which it had relied in the state courts. The suggestion is that by virtue of its display of the items at issue to the general public in areas of its store open to them, petitioner had no legitimate expectation of privacy against governmental intrusion, see *Rakas* v. *Illinois,* 439 U. S. 128 (1978), and that accordingly no warrant was needed. But there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees. See *Lewis* v. *United States,* 385 U. S. 206, 211 (1966). The Town Justice viewed the films, not as a customer, but without the payment a member of the public would be required to make. Similarly, in examining the books and in the manner of viewing the containers in which the films were packaged for sale, he was not seeing them as a customer would ordinarily see them.

Any suggestion that petitioner through its clerk consented to the sweeping search also comes too late. After Lo-Ji's agent was placed under arrest and was aware of the presumed authority of the search warrant, his conduct complying with official requests cannot, on this record, be considered free and voluntary. Any "consent" given in the face of "colorably lawful coercion" cannot validate the illegal acts shown here. *Bumper* v. *North Carolina,* 391 U. S. 543, 549–550 (1968). Our society is better able to tolerate the admittedly pornographic business of petitioner than a return to the general warrant era; violations of law must be dealt with within the framework of constitutional guarantees.

The judgment of the Appellate Term of the Supreme Court of the State of New York for the Ninth and Tenth Judicial Districts is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*