■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND AULETTA, Appellant. — Judgment of the Supreme Court, New York County (D. Edwards, J., at suppression hearing; Rothwax, J., at plea and sentence), rendered September 21, 1981, after denial of a motion to suppress the seizure of a gun, convicting defendant-appellant, upon a plea of guilty, of criminal possession of a weapon in the third degree; and sentencing him to an indeterminate one-year prison term; reversed, on the law and facts, the motion to suppress granted and the indictment dismissed. At the suppression hearing on May 4 and 5, 1981, three of the arresting officers, another bar patron, the bartender and the appellant, all testified as to the events culminating in the seizure of the gun. According to Police Officer Prunty, on September 24, 1980 at 3:30 A.M., the police received a radio call to proceed to the corner of Lexington Avenue and 40 Street, on a report of an attempted "assault in front of the Concord Bar". Officer Prunty and his partner, first on the scene, waited for back-up units which had been called. When the additional police arrived, the officers saw no one on the street and no activity. The original 911 tape which was played in court did not mention the Concord Bar, which was across the street. Nevertheless, the police went over to the bar and looked inside, through the windows. The officers testified that the bar is allegedly a reputed hangout for organized crime members. Prunty testified that he observed that a man standing on the opposite side of the bar was "making motions beneath the bar with his arms and hands". The police tried the door, found it to be locked and knocked. A patron unlocked the door allowing them in. At least eight police officers entered and approached the man behind the bar who allegedly had made the furtive movements and found three guns on him. Andre Mazur, a stockbroker and casual friend of appellant's for a number of years, was also present in the bar at that time. He testified he stopped in the bar on his way home. He recalled the door being bolted around 3:30 A.M. and describing the entry of the police, he said: "I [heard] * * * all of a sudden a banging on the door * * * somebody was banging on the door and the next thing I see is a

hand with a badge on it charging in and it was about I'd say eight policemen * * * They charged around the side of the bar * * * and they grabbed this one guy and they started tussling around and as they did that, some of the others, officers, made sure no one had moved * * * [t]hey searched me and they started to search some of the other patrons in the bar. They had made a girl pick up her sweater, like pull it away from her dress and her bra forward and start jumping up and down." While these events were transpiring in the bar, appellant was in the bathroom. Officer Prunty testified that he entered the men's room, found the appellant there, and directed him back to the bar. He then noticed a bulge in defendant's shirt near his waist, reached there, felt the handle of a gun which was held in defendant's waistband and took it. Officers McTigue and Kelly did not directly view the seizure of defendant's gun, but they corroborated Officer Prunty's account generally. Officer Kelly testified that the sergeant ordered everyone to stand up against the wall and that the police frisked everybody. Defendant-appellant Auletta admitted that he had a prior conviction for possessing untaxed cigarettes and that he was carrying this gun without a permit. He testified that the bathroom door burst open while he was preparing to leave the room, that Officer Prunty grabbed him, threw him out of the bathroom against the bar wall, and then searched him. The gun was in an ankle holster, according to appellant, not in his waistband. Appellant testified he was dressed only in a T-shirt and jeans. Both Mazur and Alexander Serra, the bartender, corroborated appellant's version. Mazur supported the version that the police pushed the bathroom door in, grabbed appellant and started searching him. Mazur said the officer was kneeling down and came up with the gun. Serra said an officer took appellant out of the men's room, put him against the wall; bent down on his knees and began to search Auletta, retrieving the gun from Auletta's ankle. A photograph of appellant on the night of his arrest was introduced showing him dressed in a T-shirt. Officer Prunty's testimony indicated that the barrel of the weapon was positioned in such a manner as to indicate a left-handed draw. Yet, the arrest report indicated appellant's left hand could not be fingerprinted due to a deformity. Appellant testified his left arm was completely useless. Even Officer Prunty conceded that appellant's left hand was withered. After the hearing, Justice Edwards found that the bar was technically open to the public at the time of the police entry. The seizure according to the suppression court "was proper, grounded on sufficient circumstances that there was in fact reasonable suspicion based on the bulge plus circumstances". We disagree with this finding of the court below and grant the motion to suppress upon the facts presented. The predicate for the police entry can, at best, be categorized as equivocal. The radio call was not directed to the bar. In addition, the observation of one patron "making movements with his hands", even in an establishment with a reputation as an organized crime "hang-out" is not compelling as reasonable suspicion of a crime being committed. Officer McTigue testified he saw people on the other side of the horseshoe bar from the window. This is where the man allegedly making furtive movements had been seated. Yet in response to the question "Did you see anything below the bar?", Officer McTigue said "It's a wooden bar" and when the question was rephrased "Couldn't see below the bar?", he candidly replied "I don't have X-ray vision." There was not that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity [was] at hand." (*People v Cantor,* 36 NY2d 106, 112-113.) The court below found that the bar, technically, was open at the time the police entered. It, of course, is a public place. Police action must be reasonable in a public place of business. This does not mean that where the locus is characterized as a place of business, even if

entry is obtained by invitation, an agent is authorized to conduct a general search for incriminating materials. (*Lewis v United States,* 385 US 206, 211; see, also, *Lo-Ji Sales v New York,* 442 US 319, 329.) The action of the police in lining up everyone and frisking them, and in searching the bathrooms, in effect was a blanket seizure of all individuals in the bar and not permissible. (See *People v James,* 81 AD2d 795.) In any event, the search of appellant Auletta was not proper under the circumstances. The police officers' expressed apprehension after finding the three guns on a patron did not justify the search which took place of the other individuals present. (See *People v Griffith,* 63 AD2d 138; *People v James, supra.*) There was no immediate threat to the safety of the officers, 8 to 10 of whom were present with their guns drawn. The search of appellant on the basis of Officer Prunty's observation of a "bulge" was not justified pursuant to the guidelines set down by the Court of Appeals in *People v Prochilo* (41 NY2d 759, 761-762). "The ultimate determination will depend on a balancing of the legitimate interests of the defendants against the reasonableness and appropriateness of the police action. At least three aspects of each individual transaction should be considered. Was there proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession? Was the manner of the officer's approach to the defendant and the seizure of the gun from him reasonable in the circumstances? Was there evidence of probative worth that there had been a pretext stop and frisk or that the police were otherwise motivated by improper or irrelevant purpose? There will be other material considerations, too, in individual cases. Because the totality of the circumstances in each case is necessarily unique, there should be no expectation that comparable significance will always attach to the same or similar factors in different cases." Even accepting Officer Prunty's account that he noted a bulge in appellant's T-shirt, he testified specifically that he did not see the outline of a gun. (Cf. *People v Goings,* 41 NY2d 759.) Although the court below credited the police testimony in the totality of the circumstances present herein, the manner of the officer's approach to appellant and the seizure of the gun cannot be said to have been reasonable. Likewise, there was not nor could there have been reasonable suspicion that appellant was about to commit or had committed a crime. The "bulge" story is plainly unjustified by the evidence and perhaps "tailored to nullify constitutional objections". (*People v Garafolo,* 44 AD2d 86, 88.) The pistol was inside an ankle holster when recovered. Defendant testified that the gun was strapped to his ankle, and the two defense witnesses testified the police officer knelt down to recover the gun from the defendant's ankle. Further, the police officer stated that the gun was positioned on the appellant for a "left-handed draw". The testimony unequivocally established appellant's left hand was deformed and unable to hold a gun. Even the police officer who saw the "bulge" upon appellant at the bar, did not, according to his own testimony, see a "bulge" in appellant's T-shirt when he ordered appellant out of the men's room. Again the same police officer testified that this was *the first time* he had ever seen someone wear an ankle holster inside the waist. Interestingly, this officer's partner testified he had an ankle holster which he wore in his belt at times. Obviously, he must have been more successful in concealing the fact that he wore an ankle holster from his partner, than was appellant. Moreover, not only the testimony but the photo of appellant taken the night of his arrest showed that he was wearing a tight-fitting T-shirt, which could hardly conceal the outline of a gun in a holster. Under the circumstances of the disinterested defense witnesses and the physical evidence which buttressed their stories, the testimony of the prosecution witnesses must be deemed incredible as a matter of law. It was " 'manifestly untrue, physically impossible, contrary to experience [and] self-contradic-

tory' ". (*People v Garafolo, supra,* at p 88.) There were no exigent circumstances which justified the police to enter the bar. Even after the initial recovery of the guns, there was no legal basis for the blanket search of the bar. Moreover, the search of the appellant was not "reasonably related in scope to the circumstances which rendered its initiation permissible" (*People v Cantor, supra,* at p 111), even if the action of the police could be deemed justified at its inception. Concur — Murphy, P. J., Lupiano, Fein, Lynch and Asch, JJ.