OPINION.
{¶ 1} This appeal addresses under what circumstances the police may enter private premises without a warrant to secure evidence that they believe is in the process of being destroyed. The plaintiff-appellant, the state of Ohio, argues that the trial court misunderstood those circumstances when it granted the motion to suppress of the defendant-appellee, Mcarron Martin. Martin had been charged with seven felony drug offenses involving trafficking in cocaine and possession of both marijuana and cocaine. Evidence of four of the counts was seized pursuant to a search warrant, but only after the police had earlier entered Martin's apartment with the manager's key to secure evidence that they believed Martin was in the process of destroying based on sounds audible through the door.
 {¶ 2} In its single assignment of error, the state argues that the trial court erred in concluding that the initial police intrusion into Martin's apartment was not justified under the exception to the Fourth Amendment that allows for warrantless home entries based on exigent circumstances. In the state's view, exigent circumstances existed because the police heard telltale sounds of narcotics evidence being destroyed after they had knocked and identified themselves. Martin, on the other hand, argues that the police could not benefit from the exception because their own actions created the circumstances leading to the destruction of the evidence.
 {¶ 3} For the following reasons, we reverse the trial court's order granting Martin's motion to suppress.
 FACTS PRESENTED AT SUPPRESSION HEARING {¶ 4} Cincinnati Police Detective Ken Baker, a four-and-one-half-year veteran of the Street Corner Unit, a drug interdiction squad, testified that on July 22, 2003, he and other members of the unit (seven or eight undercover officers and two uniformed officers) responded to an informant's tip that an individual named Ray Johnson was selling drugs on the corner of Melrose and Taft in Walnut Hills. After Baker, who was in plainclothes, and his colleagues set up surveillance of Johnson, they saw Martin walk up to Johnson and begin a conversation. They then observed the two men walk to an apartment building on William Howard Taft Road. Several minutes passed before Martin came back out of the apartment building and appeared to look around before going back inside. Minutes later, Johnson came out of the building and walked over to a silver BMW automobile parked along the street. The automobile was later determined to belong to him. Baker testified that it appeared that Johnson was "concealing something under his shirt." Johnson got in the BMW and sat in the driver's seat.
 {¶ 5} At that point, Baker and his surveillance team sent their informant, who had been wired for sound, over to Johnson's vehicle to purchase $20 worth of crack cocaine. Reporting back to the surveillance team after the successful purchase, the informant told the officers that Johnson had additional crack cocaine in the console of his vehicle. After Johnson got out of his vehicle and stepped into another vehicle to make a second sale, the surveillance team moved in and arrested him for trafficking.
 {¶ 6} Baker testified that he was familiar with Johnson at the time of his arrest, having previously spoken to him in an effort to convince him to quit the drug trade. He stated that Johnson, immediately after being read his Miranda rights, told him that Martin had a kilo, or 2.2 pounds, of cocaine in his apartment along with 20 pounds of marijuana. Baker testified that he then took Johnson back to his BMW, which the police searched, discovering an additional quantity of drugs — 250 grams of powder cocaine in two blocks lying on the floorboard, as well as 43 grams of crack cocaine in the center console of the stick shift. According to Baker, Johnson admitted that the crack cocaine was his, but he claimed that the powder cocaine belonged to Martin.
 {¶ 7} At that point, Baker testified, Johnson suddenly interrupted their conversation and pointed toward Martin standing in front of the locked, gated door of the apartment building, identifying him as the person to whom he had been referring. Baker testified that he approached Martin, who was watching Johnson's arrest, and stated, "I need to talk to you." According to Baker, Martin responded by shutting the gate and running into the building.
 {¶ 8} Baker testified that he shouted for the apartment manager, whose apartment was near the entry, who came to the gate and unlocked it. Baker, other officers, and Johnson then accompanied the apartment manager to the second floor. He testified that Johnson was allowed to accompany them upon the promise that he would show them the door behind which Martin kept his cocaine and marijuana.
 {¶ 9} Baker testified that Johnson stopped them at apartment 4, pointed to the door, and declared, "That's where he's got the kilo." At the same time, Johnson spotted an elderly gentleman in the hallway, another tenant of the building whom he also recognized, and identified him to the police as someone who also kept drugs in his apartment. Several police then separated and searched the elderly gentleman's apartment after receiving his consent, while Baker and others stood outside apartment 4, knocking on the door. Baker testified that he shouted through the door that they were police officers, at which point, he stated, he began to hear "a lot of ruckus, glass breaking behind the doorway." He stated that this noise, including the sound of somebody running around inside, continued for approximately 30 seconds. During that time, Baker testified, one of the other members of the unit talked to neighbors, who informed him that the person inside apartment 4 was the same person who had run from them earlier — in other words, Martin.
 {¶ 10} Baker described how he continued knocking and was able to hear a toilet "repeatedly starting to flush." Although Baker testified that he had already determined that there was probable cause to obtain a search warrant for the apartment, he was concerned that evidence in the apartment was being destroyed. He testified that, as a veteran of the Street Corner Unit, he had experienced "several instances" in the past where drug dealers had flushed contraband down the toilet. Asked how he was sure that the flushing was not the result of normal use of the toilet, Baker replied, "First, it wasn't just a couple of seconds of, you know, one flush, like a normal sanitation flush would be. It was a lot of commotion, you know, things breaking in the apartment, repeated flushing, some more sounds shuffling around in the apartment, some more flushing. It was not one solid flush. It was flushing one minute, more flushing, and it was staggered."
 {¶ 11} Although the process of obtaining a search warrant had already begun, according to Baker, the decision was made to gain entry into the apartment because "at that instant, we felt that it [the evidence] was all being destroyed." Baker testified that it was his experience that obtaining a warrant normally took two hours, and, in his view, "we didn't have enough time." One of the other officers then obtained a key from the apartment manager and used it to open the door to apartment 4. Upon entry, the other officer went towards the bathroom while Baker went into the kitchen. Baker stated that they found the apartment empty with "paraphernalia and narcotics lying about * * * in open view."
 {¶ 12} Upon inspection of the bathroom, the toilet was found to be "continuously running" with what "appeared to be a white powdery substance around the bowl of the toilet." Elsewhere, "lying around the apartment," the officers found cooking utensils, spatulas with white residue on them, and empty white-powdered bags. A glass coffee table had been flipped over and the glass shattered. According to Baker, what appeared to be crack pipes and other paraphernalia were scattered on the floor around the table. Other items discovered included an electronic scale with crack residue and an Exacto knife. Baker also saw a large amount of currency on top of the refrigerator.
 {¶ 13} According to Baker, once the officers determined that the apartment was empty, they "backed out." He explained that they felt that they had the apartment secured and were satisfied to wait until a search warrant was obtained. Baker stayed on the scene but communicated by cellular telephone to aid in drafting the affidavit to support the effort to obtain a warrant. After the warrant was obtained, the officers, including Baker, went back into apartment 4 and recovered approximately 550 grams of crack cocaine and 650 grams of powder cocaine.
 MOTION TO SUPPRESS {¶ 14} After he was located and arrested, Martin was charged, as noted, with seven drug-related counts under R.C. 2925.03 and2925.11. Among the counts were specifications that he was a major drug offender and that he had a firearm on or about his person, or under his control, while committing the offense of possessing marijuana. Only four of the counts (3, 4, 5, and 6) were brought as a result of evidence recovered from apartment 4. Two of the counts (1 and 2) resulted from Martin's earlier activities outside his apartment and the drugs recovered from Johnson's BMW. The final count (7) stemmed from marijuana recovered from another apartment.
 {¶ 15} Prior to trial, Martin filed a motion to suppress all the evidence obtained from the police intrusion into apartment 4, both before and after the search warrant was obtained. Martin argued that the initial warrantless police intrusion in response to sounds heard through the door was invalid under the principle that the police cannot create their own exigent circumstances, which they did by knocking on the door and announcing their presence. He further argued that the affidavit then used to obtain a search warrant, after the police had entered and secured the evidence, was invalid because it was based, in part, on information obtained from the illegal warrantless intrusion.
 {¶ 16} The trial court granted Martin's motion to suppress based upon its belief that our decisions in State v. Sheppard
(2001), 144 Ohio App.3d 135, 759 N.E.2d 823, and State v.Jenkins (1995), 104 Ohio App.3d 265, 661 N.E.2d 806, compelled such a result. In making its decision, the court indicated that it felt all the evidence seized, both before and after the police obtained the search warrant, was tainted by the illegality of the initial entry into Martin's apartment to secure the evidence. The court stated, however, that it took such action only because of its interpretation of Sheppard and Jenkins. "I want to make sure that's clear on the record. I personally don't think anybody did anything wrong. I have to follow the law, and that's what it is."
 {¶ 17} The state subsequently filed the present appeal from the suppression of evidence relating to counts 3, 4, 5, and 6 of the indictment.
 ANALYSIS {¶ 18} The primary issue in this appeal, as framed by the parties, is whether the Fourth Amendment permitted the police to forego the normal warrant requirement and force entry into apartment 4. Both the state and Martin agree that if the Fourth Amendment did permit the police to enter without a warrant, it did so upon the basis of the exception for exigent circumstances.
1. Exigent Circumstances
 {¶ 19} Exigent circumstances permit the police to gain entry into a residence without a warrant provided that there is probable cause, and provided that there is a heightened degree of exigency demanding that the police act immediately rather than expend the time necessary to obtain a warrant. Stated more artfully, exigent circumstances exist where "there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Almonte (C.A.1, 1991), 952 F.2d 20, 22, quoting United States v. Adams (C.A.1, 1980), 621 F.2d 41, 44.
 {¶ 20} There is no general emergency exception to the warrant requirement. Rather, exigent circumstances apply to only certain scenarios, including (1) "hot pursuit" of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) risk of undetected escape by a suspect within a residence; and (4) threat of harm posed by the suspect, to either himself, the public, or the police. Hagartyv. Somerset County (C.A.1, 1995), 53 F.3d 1367, 1374.
 {¶ 21} Although this case arguably contains elements of hot pursuit and a risk of escape, the state has chosen to rely exclusively upon the threatened destruction of evidence as the justification for the police entering apartment 4.
2. State's Burden of Proof
 {¶ 22} Because of the presumption of unreasonableness that attaches to all warrantless home entries, the burden is on the government to demonstrate exigent circumstances. Welsh v.Wisconsin (1984), 466 U.S. 740, 750, 104 S.Ct. 2091. In determining whether the government has met its burden, no single fact is considered dispositive; rather, the totality of the circumstances must demonstrate that the law enforcement agents were confronted with a compelling need to make an immediate entry. United States v. Crespo (C.A.2, 1987), 834 F.2d 267, certiorari denied (1988), 485 U.S. 1007, 108 S.Ct. 1471. The circumstances must demonstrate all the following: (1) clear evidence of probable cause; (2) a crime of sufficient severity; (3) likely destruction of evidence; (4) an intrusion only of the scope necessary to protect the evidence; and (5) clearly defined indicators of exigency that are not subject to police manipulation or abuse. United States. v. Aquino (C.A.10, 1970),836 F.2d 1268, 1270.
 {¶ 23} While the presence of contraband does not, without more, give rise to exigent circumstances, there is a recognition that in narcotic cases the need to invoke the exigent-circumstances exception may be "particularly compelling" given the relative ease with which narcotics in powder or chemical form can be quickly destroyed. See United States v.Tobin (C.A.11, 1991), 923 F.2d 1506, 1509, certiorari denied (1991), 502 U.S. 907, 112 S.Ct. 299, citing United States v.Young (C.A.11, 1990), 909 F.2d 442, 446.
 {¶ 24} The test for whether exigent circumstances exist is an objective one. Young, supra, at 446. "The appropriate inquiry is whether the facts * * * would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." Id., quoting United States v. Rivera
(C.A.7, 1987), 825 F.2d 152, 156, certiorari denied (1987),484 U.S. 979, 108 S. Ct. 494.
3. The Telltale Flushes
 {¶ 25} As noted, Baker testified that, in his experience as a veteran of the Street Corner Unit, drug suspects often flushed drugs down the toilet to avoid their seizure, and in his opinion the repeated nature of the flushing audible beyond the door of apartment 4 clearly went beyond that necessary for sanitation purposes. He testified that the repeated, staggered flushing, combined with the other sounds of frenzied activity — glass shattering and a person running about — convinced him that evidence was being destroyed as he and his colleagues waited outside. He also testified that it was his experience that the normal time it took to process a search warrant was two hours, and in his view, as he discussed among his fellow officers, that was simply too long to wait if crucial evidence was going to be preserved.
 {¶ 26} Martin does not seriously challenge the sufficiency of this evidence to create an objective belief that evidence might have been destroyed had Baker and his fellow officers not acted immediately. Rather, as he did below, he argues that the officers were not allowed to act upon the sounds they heard because the sounds were precipitated by their knock and announced presence. By knocking on the door, Martin argues, the police created their own exigent circumstances, something the exception does not allow. See United States v. Morgan (C.A.6, 1984),743 F.2d 1158, 1163; United States v. Johnson (C.A.8, 1990),904 F.2d 443; and United States v. Thompson (C.A.5, 1983), 700 F.2d 944,950 (citing cases).
4. Knock and Announce Creating the Exigency
 {¶ 27} As has been observed, "[I]n some sense the police always create the exigent circumstances that justify warrantless entries and arrests. Their discovery of the criminal causes him to flee; their discovery of the contraband causes the criminal's attempt to destroy or divert the evidence. For the claim of exigent circumstances to be adequately evaluated, the better question to ask is: how did those urgent circumstances come about? This antecedent inquiry — into the reasonableness and propriety of the investigative tactics that generated the exigency — seems to be what courts have in fact been doing in these kind of cases." United States v. Duchi (C.A.8, 1990),906 F.2d 1278, 1284.
 {¶ 28} Conducting such an "antecedent inquiry," we note that there was no evidence that the knock-and-announce by Baker and his men was a pretext, a ruse, or a contrivance created by them to precipitate a crisis that did not exist. See United States v.MacDonald (C.A.2, 1990), 916 F.2d 766, 776-777 (Kearse, J., dissenting). The evidence showed a rapidly unfolding situation in which the police followed Martin to his door and did what perhaps any reasonable officers might have done to try to make their job a little easier — knocked and announced their presence to see if Martin, who had earlier fled, might have thought better of his actions and come to the door. Meanwhile, the officers began the process of obtaining a warrant to force entry if he did not.
 {¶ 29} In MacDonald, the court rejected an argument identical to Martin's, that the police impermissibly created their own exigent circumstances by knocking on the suspect's door and announcing their presence. The court noted that the police were attempting a peaceful entry based upon the suspect's consent when they began to hear the sounds of narcotics being destroyed. Finding nothing unreasonable in their conduct, the court stated, "Exigent circumstances are not to be disregarded simply because the suspects chose to respond to the agents' lawful conduct by attempting to escape, destroy evidence, or engage in any other unlawful activity. The fact that the suspects may reasonably be expected to behave illegally does not prevent law enforcement agents from acting lawfully to afford the suspects the opportunity to do so. Thus, assuming arguendo that there were no exigent circumstances before the knock, the agents' conduct did not impermissibly create the circumstances occurring thereafter." Id. at 771. See, also, United States v. Acosta (C.A.3, 1992),965 F.2d 1248.
 {¶ 30} By accepting Martin's position, we note that the police could have availed themselves of the exception had they heard the same noises by merely standing outside the door to his apartment, but not after they knocked and announced their presence. In short, application of the exigent-circumstances exception, in Martin's view, hinged upon conduct of the police that was in no way illegal or improper. Such a result is directly contrary to usual Fourth Amendment analysis, which focuses on unreasonableness and official abuse.
 {¶ 31} Significantly, the court in MacDonald, citingHorton v. California (1990), 496 U.S. 128, 110 S.Ct. 2301, expressed its view that it was immaterial to the objective inquiry whether the officers involved were "interested" in having the suspect react in a way that provided them exigent circumstances. McDonald at 772. In other words, the court believed that even if the officers knocked and announced their presence hoping to hear the sounds of evidence being destroyed within, thus giving them grounds to force entry, it was of no consequence. In Horton, where the United States Supreme Court eliminated the inadvertence requirement for the plain-view exception, the Court declared that "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. Horton, supra, at 138, 110 S.Ct. 2301.
 {¶ 32} We do not go so far as MacDonald to suggest that the motive of the police is never material to the issue of exigent circumstances, or that the mere legality (or absence of illegality) of their conduct is dispositive of the issue of whether they manifestly contrived to create their own exigent circumstances. "There is no absolute test for the presence of exigent circumstances because such a determination depends on the unique facts of each controversy." United States v. Wicks
(C.A.10, 1993), 995 F.2d 964, 970 (internal quotations omitted). In cases involving controlled deliveries of drugs by the police into dwellings that they already suspect of drug activity, courts have closely examined the facts to determine if the police had purposefully created or greatly increased the danger that evidence would be destroyed. See, e.g., Duchi, supra.
 {¶ 33} The test being one involving the totality of the circumstances, the purpose of the police is certainly, in our view, a factor to be considered as part of that totality. In this case, however, even putting the state to its burden of proof, we can find nothing that would indicate that the police acted other than reasonably in a situation that legitimately called for quick action. In sum, the knock-and-announce was simply that. We agree with the trial court in this regard, when it stated that it could not conclude that the police had done anything wrong.
 STANDARD OF REVIEW {¶ 34} In reviewing a trial court's decision to suppress evidence, a court must engage in a two-step inquiry. First, the trial court's findings of historical fact are reviewed deferentially and only disturbed if they are clearly erroneous after giving "due weight to the inferences drawn from those facts by the trial court." Ornelas v. United States (1996),517 U.S. 690, 699, 11 S.Ct. 1657. The trial court's legal conclusions drawn from the historical facts, however, are reviewed de novo. Id.
 {¶ 35} This case is somewhat unique in that the trial court did not make any factual findings other than to conclude that the police had not done anything wrong. We interpret this to mean that the police were acting reasonably and without any contrivance to create a false set of exigent circumstances.
 {¶ 36} Despite this conclusion, the trial court still felt compelled to grant Martin's motion because it believed that the decisions of this court in Sheppard and Jenkins, supra, required that it find that the police had created their own exigent circumstances. There is, however, a crucial factual distinction between those cases and this one.
1. Sheppard and Jenkins — No Exigent Circumstances Before theIntrusion
 {¶ 37} In Sheppard, supra, the defendant had escaped arrest for a drug transaction the day before by assaulting and running from a police officer. The next day, a team of officers returned to the neighborhood of the assault in an attempt to identify the defendant. After several people told them in which apartment building the defendant lived, the officers went to the defendant's door, knocked, and received no response. One of the officers then climbed onto the building's fire escape and saw the defendant through the window. The defendant, realizing that he had been spotted, darted into a back bedroom. At that point, without seeing any drugs or weapons, or hearing anything untoward, the police officers entered the apartment without a warrant.
 {¶ 38} As can be seen, the only evidence of exigent circumstances in Sheppard before the warrantless intrusion took place was the defendant darting into a back room. Similarly, inJenkins the police officer broke into an apartment simply because the occupant, who had come to the door in response to his knock, refused to let him in and then pulled down a shade. BothJenkins and Sheppard are more correctly viewed not as cases in which the police created their own exigent circumstances, but as cases in which no exigent circumstances were created or were otherwise shown to exist prior to the forced entry.
2. State v. Hatcher — Exigent Circumstances Existing Beforethe Intrusion
 {¶ 39} Conversely, the facts presented in State v. Hatcher
(Sept. 3, 1999), 1st Dist. No. C-980938, are almost directly on point. In Hatcher, the police, after knocking, heard sounds similar to those Baker and his fellow officers heard outside apartment 4: sounds of scurrying about, paper tearing, and the toilet flushing. As we noted in Hatcher, the difference between that case and Jenkins (and, for that matter, Sheppard, which had yet to be decided) was that the police heard sounds leading them to believe that evidence was being destroyed before they forced entry. Because the telltale sounds preceded the warrantless entry, and thus were its cause rather than its result, we found nothing unreasonable or constitutionally impermissible about the warrantless entry.
 SCOPE OF THE INTRUSION {¶ 40} When a warrantless intrusion is justified by the need to preserve evidence, the scope of the intrusion is limited to that necessary to secure the evidence. Aquino, supra, at 1272; see, also, State v. Brewster, 157 Ohio App.3d 342,2004-Ohio-2722, 811 N.E.2d 162, ¶ 32. As we noted in Brewster,
any entry based on exigent circumstances is "`strictly circumscribed by the exigencies which justif[ied] its initiation.'" Id., quoting State v. Applegate,68 Ohio St.3d 348, 350, 1994-Ohio-356, 626 N.E.2d 942. Here, Baker testified that after the officers used the apartment manager's key to gain entrance to Martin's apartment, they quickly swept through the interior, looking for Martin, who had fled out the bathroom window, and then left the evidence in place, believing that it was secure now that Martin was gone. A search warrant was later obtained, and it was pursuant to that warrant that evidence was actually seized and removed from the apartment.
 {¶ 41} We hold that the police properly limited the scope of their intrusion into apartment 4 to only that necessary to secure the premises and to ensure that evidence would not be destroyed.
 FRUIT OF THE POISONOUS TREE {¶ 42} In his motion to suppress, Martin challenged the affidavit supporting the search warrant that was later obtained by Baker and his fellow officers to fully search his apartment and seize evidence. He argued that the any information in the affidavit obtained as a result of the illegal entry should have been "excised" from the affidavit as fruit of the poisonous tree, and that the remainder of the affidavit was "so lacking in probable cause as to render official belief in its validity objectively unreasonable."[1]
 {¶ 43} The affidavit for the search warrant was admitted into evidence at the suppression hearing. We have reviewed it in its entirety. In addition to facts relating to the controlled buy, Johnson's post-arrest statements concerning drugs in the apartment, and the sounds heard through door, the affidavit included the following information: "When officers made entry, they performed a protective sweep of the apartment. There was no one in the apartment but the bathroom window was open, and the toilet was running, and there was residue in the toilet that appeared to be cocaine. There were also plastic wrappings in the kitchen that had cocaine on them, and cooking utensils with cocaine residue on them."
 {¶ 44} As we do not agree that the police entry was illegal, we reject Martin's argument, apparently accepted by the trial court, that the information in the affidavit resulting from the warrantless intrusion could not be used to support a finding of probable cause. This being so, we note that, in determining the sufficiency of probable cause in an affidavit, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates (1983),462 U.S. 213, 238-239, 103 S.Ct. 2317.
 {¶ 45} Further, neither trial courts nor appellate courts are entitled to substitute their judgment for that of the magistrate by conducting a de novo probable-cause determination. Rather, a reviewing court must simply ensure that the magistrate had a substantial basis for concluding that probable cause existed. Id.; see, also, State v. George (1989), 45 Ohio St.3d 325, 330,544 N.E.2d 640. In so doing, the reviewing court must accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases should be resolved in favor of upholding the warrant. George at 330, citing Gates.
 {¶ 46} Applying this deferential standard, we hold that the affidavit was not deficient and that it more than adequately supported the magistrate's finding of probable cause. Accordingly, the trial court erred when it granted Martin's motion to suppress the evidence seized pursuant to the search warrant.
 {¶ 47} The state's single assignment of error is well taken, and the judgment of the trial court is reversed. This cause is remanded for further proceedings in accordance with the terms of this Opinion.
Judgment reversed and cause remanded.
Doan, P.J., and Painter, J., concur.
[1] As noted, at the conclusion of the suppression hearing, after reluctantly concluding that the police entry was improper under our decision in Sheppard, the trial court appeared to adopt Martin's reasoning as to the invalidity of the affidavit, stating, "Having granted this, then I also grant your motion to suppress with regard — I mean, included within this is also that the affidavit at that point is deficient as well."