Filed 5/6/16  P. v. Mendoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ISAIAH GABRIEL MENDOZA, <br><br> Defendant and Appellant. | H042044 <br> (San Benito County <br> Super. Ct. No. CR-12-00156) <br><br> **ORDER MODIFYING OPINION AND DENYING REHEARING** <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 26, 2016 be modified as follows:

On pages 15 to 16, replace the last sentence of the paragraph that begins on page 15 and ends on page 16 with the following:

"Defendant's assertion, made after he was confronted with the fact that the victim's name had not been released to the public or the press, that he had learned the victim's name from the victim's son, who (together with the victim) had been previously attacked by six persons (including Copado and Copado's brother), could be rejected as lacking credibility."

There is no change in judgment.  The petition for rehearing is denied.

Dated:_____          _____

                                                     ELIA, ACTING P.J.

_____          _____

BAMATTRE-MANOUKIAN, J.                                   MIHARA, J.

Filed 4/26/16  P. v. Mendoza CA6 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ISAIAH GABRIEL MENDOZA,<br><br>     Defendant and Appellant. | H042044<br>(San Benito County<br>Super. Ct. No. CR-12-00156) |

Isaiah Gabriel Mendoza (defendant) appeals from a judgment of conviction of voluntary manslaughter (Pen.Code, § 192, subd. (a))[1] after a plea of no contest and admissions of a gang enhancement allegation (§ 186.22, subd. (b)(1)(C)), an allegation that he personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)), and an allegation allowing him to be prosecuted in adult criminal court (Welf. & Inst. Code, § 707, subd. (d)(2)(C)(ii)).  Defendant is challenging the denial of his motion to suppress evidence obtained under two search warrants, one of which authorized a search of his residence and the other of which authorized the collection of his DNA by means of buccal swabs or blood samples.  (See § 1538.5, subd. (m).)

On appeal, defendant asserts that the search warrants were not supported by probable cause and that the trial court erred by denying his motion to suppress.  He also maintains that the good faith exception to the exclusionary rule is inapplicable.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

We conclude that each affidavit provided a substantial basis to determine that probable cause supported issuance of the search warrant. Further, the question of probable cause was close and debatable and, consequently, the good faith exception would apply if the affidavits were determined to fall short of probable cause. Accordingly, the trial court's denial of the motion did not constitute error, and we will affirm the judgment.

I

*Procedural History*

An information, filed December 12, 2012, charged defendant with willful, deliberate, and premeditated murder (§§ 187, subd. (a), 189) (count 1) and active participation in a criminal street gang (§ 186.22, subd. (a)) (count 2). It set forth numerous allegations with respect to those offenses.

By notice filed on June 3, 2013, defendant moved to suppress evidence pursuant to section 1538.5. In the supporting memorandum, he argued that the search warrant affidavits did not supply probable cause to search defendant's home or person and that the good faith exception was inapplicable. He asserted that the affidavits contained material misstatements and omissions. The People filed opposition, and defendant filed a response.

On November 20, 2013, an extensive hearing was held on defendant's motion. Detective Theresa Aguilera, the affiant of both search warrant affidavits, testified, and she acknowledged there were certain errors in her affidavits. The trial court determined that Officer Aguilera did not deliberately or recklessly mislead the magistrate in her affidavits.[2] It denied defendant's motion to suppress.

_____

[2] Defendant does not challenge that aspect of the ruling on appeal. *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*) held: "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, (continued)

2

On December 19, 2013, for the purpose of facilitating defendant's negotiated plea in exchange for a 22-year prison term, the court allowed the People to add a charge of voluntary manslaughter (§ 192, subd. (a)) (count 3) and three associated allegations, specifically, allegations under section 186.22, subd. (b)(1)(C) (gang enhancement), section 12022, subd. (b)(1) (personal use of a deadly or dangerous weapon), and Welfare and Institutions Code section 707, subdivision (d)(2)(C)(ii) (age and gang circumstances that permitted defendant to be prosecuted "in a court of criminal jurisdiction"). Defendant pleaded no contest to voluntary manslaughter and admitted the three allegations. The court sentenced defendant to a total sentence of 22 years in state prison, which consisted of the upper term of 11 years on count 3, a consecutive 10-year term for the gang enhancement, and a consecutive one-year term for personal use of a deadly or dangerous weapon. The court dismissed counts 1 and 2.

---

and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (*Id*. at pp. 155-156.) "A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing [by a preponderance of the evidence] an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 484.) As the result of the "Right to Truth-in-Evidence" provision of the California Constitution (now Cal. Const., art. I, § 28, subd. (f)(2)), the exclusionary rule applies to evidence derived from governmental searches and seizures only to "the extent that exclusion remains federally compelled." (*In re Lance W.* (1985) 37 Cal.3d 873, 887.) Under the federal constitution, "the magistrate is the sole protection of a citizen's Fourth Amendment rights . . . in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination." (*Franks*, *supra*, at p. 170.)

Defendant timely filed a notice of appeal based on the denial of his motion to suppress.

## II

### *Discussion*

A. *Search Warrant Affidavits*

The two search warrant affidavits at issue in this case were executed by Detective Aguilera, who was employed by Hollister Police Department, and submitted to magistrates who issued search warrants, one to search defendant's residence and the other to collect his DNA. The affidavits were essentially the same except for their summation paragraphs. They both reflected the following facts.

At about 8:27 p.m. on January 4, 2011, Officer Leland was dispatched to the 300 block of Hill Street to investigate a reported assault. When he arrived on the scene, Officer Leland observed 39-year-old Mark Albert Arballo lying on the ground in front of 400 Hill Street. Arballo had suffered major facial and head trauma and there was a large amount of blood on his face and head. He was "flight evacuated" to a bay area hospital.

Officer Leland contacted Heriberto Soto, the reporting party, and Erica Acopa, Soto's girlfriend. Soto informed Officer Leland that he had been driving with Acopa toward Hill Street from Vista Park Hill Court. As Soto turned onto Hill Street, he observed seven males, ages 18 to 24 years of age, running northbound on Hill Street. They were dressed as "gangsters"; they were wearing white, black, and red and covering their faces. As Soto continued driving on Hill Street, he observed a body in the roadway and pulled over. The person had been severely beaten, and he was bleeding from his head and face. Soto immediately called police. Acopa corroborated Soto's statement, but she said that she saw seven males and one female running.

During a search of the area the following day, January 5, 2011, a shirt that appeared to have bloodstains and was recently burned was found in a trashcan on the sidewalk in front of a Vista Park Hill Court address. As Detective Aguilera collected that

4

evidence, Matthew W. approached volunteers assisting in the search, and he identified himself and advised that he lived at that address.  Matthew gave his permission for the volunteers and the detective to search his front yard.

Detective Aguilera learned that Matthew was on court probation.  During a subsequent search of Matthew's residence, Detective Anderson located a burned glove in the backyard.  Detective Anderson interviewed Matthew about the burned shirt and the burned glove found on his property.  Matthew claimed that the shirt belonged to him and he had burned it, but he was "extremely evasive."  Matthew informed Detective Anderson he had further information about the persons involved, but he did not want to provide it because he was afraid of retaliation.

Detective Aguilera interviewed Matthew at the Hollister Police Department.  He claimed that he was home alone with his girlfriend when two male subjects came to his residence.  He did not want to give any further information.  Matthew was arrested for a prior burglary.

On January 11, 2011, Detective Aguilera interviewed Acopa and Soto.  Acopa told the detective that she also lived at the same address on Vista Park Hill Court as Matthew; she lived with her uncle and Matthew, who was his stepson.  On the night of the incident, Soto and she decided to go to the store.  Before leaving, she had not seen Matthew inside the residence.  But, as they were walking out of the residence, she saw the light was on in his bedroom.  While driving toward Hill Street from Vista Park Hill, she observed individuals running, but she could not see their faces because it was dark.  After finding Arballo in the roadway and giving their statements to police, they returned to her

residence. According to the affidavits, Acopa indicated that Matthew was there with three male subjects and two female subjects.[3]

After receiving information on January 12, 2011, that Matthew wanted to talk with police regarding the incident, Detective Aguilera interviewed him. Matthew disclosed that the two male subjects who had come to his residence on January 4, 2011 were Ray G. and Conrad Copado. He indicated that two females, Lizette C. and Tanya J., had also come to his residence at nearly the same time. Matthew admitted that he was at the park with the four of them earlier in the evening, but he claimed that he left the park before them and that he had been home with his girlfriend when Ray and Copado showed up. Matthew claimed that he had tried to turn them away but they had walked inside his residence. They told him that they had beat Arballo and that they wanted to take a shower and clean up. Matthew claimed he did not allow them to do so.

Detective Aguilera asked Matthew how the burned shirt ended up in his trashcan. Matthew told the detective that "Isaiah Mendoza" was involved in the incident, Mendoza had left the shirt in front of a shed across the street from his residence, and Copado had seen the shirt and thrown it in the trashcan. But Matthew indicated that "Mendoza did not respond to his residence" with the four others.[4] During the interview, Matthew stated that "he was a Norteño gang member and the subjects that were involved in the incident were also apart [*sic*] of the Norteño Criminal Street Gang."

Detective Aguilera conducted a records check, and she found Isaiah Mendoza, who was born in 1995, and an associated address. When Matthew was shown a photo

---

[3] During the *Franks* hearing (see fn. 2, *ante*), Detective Aguilera admitted that she had erred and Acopa had actually told her that *two*, not three, males were present in addition to Matthew.

[4] In the summation paragraph of the affidavit in support of the search warrant to obtain defendant's DNA, Detective Aguilera inconsistently stated that defendant was identified by Matthew "as the subject that responded to his house . . . ."

lineup that included defendant's photograph, Matthew identified "Mendoza in the photo lineup as the subject that was involved in the incident as well."[5]

Detective Aguilera contacted defendant regarding the incident at San Andreas High School. Defendant was "extremely nervous." Defendant knew that the victim was Arballo, but he denied any involvement in the incident. When confronted with the fact that Arballo's name had not been released to the public or the press, defendant claimed that the victim's son had told him that information. Defendant declined to submit to a voluntary DNA buccal swab to eliminate him as a suspect.

Detective Aguilera interviewed Tanya, who said that she was at Park Hill with her friend Lizette and five male subjects on the evening of the incident and they were drinking shots of Bacardi. Tanya identified four of the males as Conrad, Ray, "Matt," and "CAY." Tanya remembered Lizette telling her to run but she "could not remember why she was running because she blacked out." Tanya also "remembered going to Matt's house and being there for a while." She was shown photo lineups, but she identified only Ray.

Detective Anderson interviewed Lizette, who corroborated that she was drinking with Tanya at Park Hill. She would not provide the names of the others present. Although she denied knowing Matthew, she told the detective that she went to "Matt's house."

On January 19, 2011, Detective Aguilera interviewed Copado. Copado disclosed that, on the day of the incident, he received a phone call from Lizette, who told him that

_____

[5] During the *Franks* hearing (see fn. 2, *ante*), Detective Aguilera acknowledged that, in the summation paragraph of her affidavit supporting issuance of a warrant to search for property located at defendant's apartment, she had stated that defendant was "identified in a photo line-up as a subject involved in the area during the time of the incident by *several* subjects contacted . . . ." (Italics added.) She conceded that her use of the word "several" was error because the identification was not made by "several subjects."

she had alcohol and wanted to meet at Park Hill. Copado stated that he met Lizette, Tanya, and his brother, his brother's friend, and Matt at Park Hill at about 5:00 p.m., and they were sitting at a table on the south side of the park and drinking. Ray and defendant showed up.

Copado stated that, while they were still at the table, they observed Arballo sitting at a table near the park's front entrance. Arballo spotted them, he began to walk away toward Hill Street as Ray and defendant called him over. Copado told Detective Aguilera that Ray and defendant followed Arballo, but he claimed that he tried to stop them.

According to Copado, Matthew had left the park to get a sweatshirt from his house for the girls before Ray and defendant had left, but Matthew had come back a short time later. Ray and defendant returned immediately thereafter. Copado stated that Ray's shoes were covered in blood and defendant's face and shoes were covered in blood. Copado told Detective Aguilera that Ray and defendant reported that they had beat Arballo; defendant had punched him in the stomach while Ray kicked him in the face. Copado stated that Ray and defendant asked to go to Matthew's house to clean up, and they all decided to go to Matthew's house.

Copado described defendant as wearing a white t-shirt with jeans and white shoes, the brand of which may have been "Michael Jordan." He indicated that Ray was wearing a red jersey with jeans and white shoes, the brand of which may have been "Michael Jordan."

Copado stated that, on their way to Matthew's house, Copado saw a body lying in the roadway on Hill Street. According to Copado, after they arrived at Matthew's house, Matthew went to the bathroom to help Ray and defendant wash off the blood. Copado saw Matthew and defendant walk out of the bathroom and go into the backyard with something wrapped in a towel. Acopa and Soto returned to the residence, told them about the incident, and said they thought Arballo was dead. Copado decided to leave.

Arballo and his son had previously been attacked and hit in the head with rocks by Copado and five other subjects (including Copado's brother) on May 10, 2010, and they had been taken to the hospital. Copado had been incarcerated, charged with a gang enhancement, and convicted. Copado's family had been required to pay restitution to Arballo. Copado is required to register as a gang member.

B. *Probable Cause Standard*

"Probable cause sufficient for issuance of a [search] warrant requires a showing that makes it ' "substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." ' [Citations.] That showing must appear in the affidavit offered in support of the warrant. [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 161 (*Carrington*).) "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Illinois v. Gates* (1983) 462 U.S. 213, 238-239 (*Gates*); see *id.* at p. 239 [The affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause . . . ."].)

"Probable cause ' "means less than evidence which would justify condemnation. . . . It [describes] circumstances which warrant suspicion." ' (*Illinois v. Gates* (1983) 462 U.S. 213, 235 . . . .) Probable cause, unlike the fact itself, may be shown by evidence that would not be competent at trial. (*United States v. Ventresca* (1965) 380 U.S. 102, 107.)" (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 573 (*Humphrey*).) "[P]robable cause does not demand the certainty we associate with formal trials." (*Gates*, *supra*, at p. 246.) But a wholly conclusory statement fails to meet

9

the requirement of probable cause. (See *id.* at p. 239.) A magistrate's "action cannot be a mere ratification of the bare conclusions of others." (*Ibid.*)

In *Gates*, the United States Supreme Court confirmed that "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." (*Gates*, *supra*, 462 U.S. at p. 230.) The court did not "agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ." (*Ibid.*, fn. omitted.) Those elements "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." (*Ibid.*) "[P]robable cause is a fluid concept," which "turn[s] on the assessment of probabilities in particular factual contexts." (*Id.* at p. 232.)

"[I]n the criminal context, police officers may rely on hearsay (an informant's statements) in obtaining a warrant to search for incriminating evidence. ([*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74,] 87-88; *People v. Smith* (1976) 17 Cal.3d 845, 850.)" (*Humphrey*, *supra*, 29 Cal.4th at p. 573.) "Personal knowledge of facts asserted in the affidavit is not an indispensable element of probable cause." (*Id.* at p. 574.) "[A]n affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.' " (*Gates*, *supra*, 462 U.S. at pp. 241-242.)

Warrant affidavits "could show probable cause through facts asserted on the information and belief of some unquestionably honest declarants, just as detailed affidavits based on personal knowledge could show probable cause despite questions about the declarant's motives." (*Humphrey*, *supra*, 29 Cal.4th at p. 574.) "*Gates* thus created a sliding scale between ' "veracity" ' or ' "reliability" ' and ' "basis of knowledge" '; 'a deficiency in one may be compensated . . . by a strong showing as to the other, or by some other indicia of reliability.' [Citation.]" (*Ibid.*)

10

In *United States v. Leon* (1984) 468 U.S. 897 (*Leon*), the Supreme Court recognized that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and [the court had] thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination. [Citations.]" (*Id.* at p. 914.) A reviewing court determines "whether the magistrate [issuing a search warrant] had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. (*Illinois v. Gates* (1983) 462 U.S. 213, 238-239; *People v. Camarella* (1991) 54 Cal.3d 592, 600-601.)" (*People v. Kraft* (2000) 23 Cal.4th 978, 1040.) While "[t]he magistrate's determination of probable cause is entitled to deferential review[] [citations]" (*id.* at p. 1041), "reviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.' *Illinois v. Gates*, 462 U.S., at 239." (*Leon*, *supra*, 468 U.S. at p. 915.)

"When reviewing a trial court's denial of a motion to suppress evidence obtained pursuant to a warrant, '[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' (*People v. Glaser* (1995) 11 Cal.4th 354, 362; see *People v. Weaver* (2001) 26 Cal.4th 876, 924, 111.)" (*Carrington*, *supra*, 47 Cal.4th at p. 166.)

C. *Substantial Basis for Determining that Probable Cause Existed*

Defendant argues that Detective Aguilera's affidavits did not provide probable cause to search because the only information linking him to the crime were the uncorroborated, contradictory, and self-serving statements of Matthew and Copado, who were both criminal informants. Defendant contends that Matthew's and Copado's stories were quite different and either or both of them were lying. He points out that Copado's

11

statements to Detective Aguilera concerning defendant were not consistent with those of Matthew, who told the detective that defendant "did not respond to his residence."

Defendant further argues that Matthew's statements concerning him were conclusory, not shown to be based on personal knowledge, and not corroborated. Defendant further asserts that the inconsistencies in their statements rendered them "hopelessly unreliable."

Lastly, defendant claims that defendant's refusal to voluntarily provide a buccal swab cannot be considered for purposes of establishing probable cause because he was merely exercising a constitutional right.

We first address defendant's arguments that Copado's statements to Detective Aguilera were "so contradictory and self-serving as to be nonsensical" and they were "entirely uncorroborated" in essential respects. We agree that, insofar as Copado's statements exculpated him, they were not trustworthy. Nevertheless, there was a substantial basis for crediting Copado's statements concerning his own presence in the vicinity of the attack on Arballo and defendant's involvement in the incident.

Copado named eight individuals who were at the park, which included himself and five other males (Matthew, Ray, defendant, Copado's brother, and his brother's friend) and two females (Lizette and Tanya). He indicated that all of them, except Ray and defendant, met at the park at approximately 5:00 p.m. and were sitting at a table and drinking. Ray and defendant showed up later.

That information was consistent with information elicited by police from others. Matthew admitted to being at the park with Copado, Ray, Lizette, and Tanya earlier in the evening, before the attack. Lizette and Tanya each admitted that she was drinking with the other at Park Hill on the evening of the incident. Tanya indicated five males were also there and named four: Copado, Ray, whom she identified in a photographic lineup, Matthew, and "CAY."

12

Copado provided a fairly detailed account of the incident and related that it involved the group drinking at Park Hill, the spotting of the victim, and the victim walking away toward Hill Street and being followed out of the park, blood on the perpetrators, the decision to go to Matthew's house to cleanup, and the victim lying in the roadway on Hill Street. Copado described the clothing and shoes worn by Ray and defendant and the blood on those two.

Copado's statements indicated that he was in the position to have first-hand knowledge. "[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." (*Gates*, *supra*, 462 U.S. at p. 234.) In addition, since Copado's statements placed him in the vicinity of the attack on Arballo, they might be viewed as statements against interest for purposes of assessing probable cause, especially in light of Copado's conviction for a prior attack on Arballo. (See *United States v. Harris* (1971) 403 U.S. 573, 583 (*Harris*) (plur. opn. of Burger, C.J.).)

Certain of Copado's statements were corroborated by statements made by Soto and Acopa, who may be regarded as citizen informants. Statements made by citizen informants are presumptively reliable. (See *Smith*, *supra*, 17 Cal.3d at p. 852; *People v. Ramey* (1976) 16 Cal.3d 263, 268-269.) Statements of a fellow officer as to what he or she was told by an informant are presumptively reliable. (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1206, fn. 3 ["[A] fellow officer's observations, reported by the affiant as hearsay, are competent and presumptively reliable in a warrant affidavit. [Citations.]"]; *United States v. Ventresca*, *supra*, 380 U.S. at p. 111 (*Ventresca*) ["Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number. [Fn. omitted.]"].)

As Soto and Acopa were driving away from Vista Park Hill Court and turning onto Hill Street on the night of the incident, they believed that they saw seven males

13

running on Hill Street. Acopa additionally saw a female, which indicated that there was a total of eight individuals. Copado indicated there were eight individuals in the group at the park. In addition, Soto and Acopa came across the victim, who had been "severely beaten" and was "bleeding from his head and face," lying in the roadway on Hill Street. Officer Leland, who found Arballo on the ground in front of 400 Hill Street, reported there was a large amount of blood on the victim's face and head. A burned shirt with apparent bloodstains and a burned glove were found at Matthew's residence.

Matthew confirmed that Copado, Ray, Lizette, and Tanya came to his house after the attack, and he stated that Ray (and Copado) wanted to shower and cleanup. Lizette and Tanya each separately acknowledged that she had gone to "Matt's house." Matthew and Copado each placed himself, the other, and Ray in Matthew's residence after the attack.

Similarly, although Matthew's statements concerning his own lack of involvement in the incident also may be regarded as untrustworthy, there was a substantial basis for generally crediting his statements implicating defendant. Matthew impliedly had a motive to cooperate with police as the consequence of his burglary arrest. Matthew identified himself as a Norteño. This statement may be viewed as a statement against interest for purposes of assessing probable cause, which he would not have said unless true. He indicated that the persons involved in the incident were also Norteños This statement was corroborated to some extent by Soto's statement that the individuals seen running on Hill Street were dressed as "gangsters" in white, black, and red. Tanya remembered Lizette telling her to run, but she claimed not to remember the reason for running. Copado described Ray as wearing a red jersey and white shoes and defendant as wearing a white T-shirt and white shoes. Also, Copado is required to register as a gang member as a result of his conviction for the prior assault of Arballo.

Matthew's disclosure that two males, whom he later identified as Copado and Ray, visited his house after the incident was also corroborated by Acopa's statement to

14

Detective Aguilera (see fn. 3, *ante*) and Copado's statement that he went to Matthew's house. Matthew's statement that Lizette and Tanya also came to his house after the incident was likewise corroborated by Acopa's statement to Detective Aguilera and Lizette's and Tanya's statements.

Although Matthew's and Copado's statements conflict as to whether defendant went into Matthew's residence, Matthew eventually indicated that defendant's shirt had been left by defendant in front of a shed across the street from Matthew's residence and then thrown into the trashcan in front of Matthew's residence by Copado. Matthew ultimately identified defendant in a photo lineup as someone involved in the incident. The reliability of that statement was enhanced by the fact that by informing on defendant he was opening himself to retaliation. (See *Harris*, *supra*, 403 U.S. at p. 583.)

One reasonable inference was that Matthew knew the facts concerning defendant's involvement first hand, as suggested by Copado's statements concerning Matthew's whereabouts and Matthew's eventual identification of defendant as a participant. Another possibility was that Matthew obtained the information concerning defendant's involvement from the persons who had been at the park and did go to his home after the attack. While the basis of Matthew's knowledge was not directly established, the totality of circumstances indicated a fair probability that he either had personal knowledge regarding defendant's involvement in the incident or obtained that information from someone with personal knowledge. "[T]he 'risk that an informant is lying or in error need not be wholly eliminated.' [Citation.]" (*United States v. Barnard* (1st Cir. 2002) 299 F.3d 90, 94; see 2 LaFave, Search & Seizure (5th ed. 2012) § 3.3(f), p. 218.)

Defendant's extreme nervousness when interviewed by Detective Aguilera and his knowledge that Arballo was the victim of the attack, even though Arballo's name had not been released to the public or the press, buttressed the evidence indicating defendant was involved in the attack on Arballo. Defendant's claim that he had merely learned the

15

name of the victim from the victim's son, whom he had previously attacked with five others, was not credible.

We note that "in appropriate circumstances information obtained from unreliable informants may corroborate information obtained from other unreliable informants." (*People v. French* (2011) 201 Cal.App.4th 1307, 1321; cf. *People v. Terrones* (1989) 212 Cal.App.3d 139 147-149.) We also recognize, however, that "[i]nformation received from sources who are themselves the focus of pending criminal charges or investigations is inherently suspect." *People v. Campa* (1984) 36 Cal.3d 870, 882.) While we agree that Matthew's and Copado's self-serving statements exculpating themselves should be viewed with distrust, their accounts were corroborated in certain important respects.

Defendant's reliance on cases predating *Gates* is misplaced to the extent he ignores its mandate of a totality-of-the-circumstances analysis. (*Gates*, *supra*, 462 U.S. at p. 238.) We conclude that, under the totality of the circumstances presented in each affidavit, the magistrate considering the affidavit had a "substantial basis" for determining that probable cause to search existed. (See *id.* at pp. 238-239.) Thus, the searches conducted pursuant to the warrants issued based upon those affidavits were reasonable under the Fourth Amendment.

D. *Good Faith Exception to Exclusionary Rule*

Even assuming that the affidavits fell short of establishing probable cause, they certainly came very close and presented a close or debatable question on the issue of probable cause. Consequently, we turn to the good faith exception to the exclusionary rule.

The good faith exception to the exclusionary rule generally applies "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." (*Leon*, *supra*, 468 U.S. at p. 920, fn. omitted.) "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on

the subsequently invalidated search warrant.  468 U.S., at 922." (*Herring v. United States* (2009) 555 U.S. 135, 142.)  "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." (*Leon*, *supra*, at p. 921.)

*Leon* recognized, however, four situations in which the good faith exception would be inapplicable.  First, "[s]uppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.  *Franks v. Delaware* 438 U.S. 154, 98 (1978)."[6] (*Leon*, *supra*, 468 U.S. at p. 923.)  Second, the good faith exception to the exclusionary rule also does not apply "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales*, *Inc. v. New York* [(1979)] 442 U.S. 319" because "in such circumstances, no reasonably well trained officer should rely on the warrant."[7] (*Ibid*.)  Third, there is no good faith exception where the warrant affidavit is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.]" (*Ibid*.)  Lastly, "a warrant may be so facially deficient—i.e.,

---

[6] As indicated, the trial court determined that Officer Aguilera did not deliberately or recklessly mislead the magistrates in her affidavits.

[7] In *Lo-Ji Sales*, *Inc. v. New York*, *supra*, 442 U.S. 319, "[t]he Town Justice did not manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure.  [Citation.]" (*Id*. at p. 326.)  "[The Town Justice] allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." (*Id*. at p. 327.)  *Leon* stated:  "A magistrate failing to 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and who acts instead as 'an adjunct law enforcement officer' cannot provide valid authorization for an otherwise unconstitutional search.  *Lo-Ji Sales, Inc. v. New York* 442 U.S. 319, 326-327 (1979)." (*Leon*, *supra*, 468 U.S. at p. 914.)  Defendant makes no suggestion that the magistrates abdicated their role as a "neutral and detached" arbiters and merely rubber stamped the search warrants for police.  (See *ibid*.)

in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. [Citation.]" (*Ibid*.)

Defendant urges us to find that the good faith exception did not apply, impliedly relying upon the third exception to the good faith exception to the exclusionary rule. He asserts that, "as an experienced detective, Aguilera should have known that the uncorroborated and contradictory stories of two criminal informants, both implicated in a vicious beating, failed to create probable cause."

The test "is whether a reasonable and well-trained officer 'would have *known* that his affidavit failed to establish probable cause and that he should not have applied for the warrant.' [Citation.] But if such an officer would not reasonably have known that the affidavit (and any other supporting evidence) failed to establish probable cause, there is no reason to apply the exclusionary rule, because there has been no objectively unreasonable police conduct requiring deterrence. (*Leon*, *supra*, 468 U.S. at p. 919.)" (*People v. Camarella*, *supra*, 54 Cal.3d at pp. 605-606 (*Camarella*).) "The question under *Leon* . . . is not whether further investigation would have been reasonable, but whether a reasonable officer in [the affiant's] position would have *known* that the affidavit, as it existed at the time it was to be presented to the magistrate, was legally insufficient . . . ." (*Id*. at p. 606, fn. omitted.) If "a well-trained officer reasonably could have believed that the [search warrant] affidavit presented a close or debatable question on the issue of probable cause," then it cannot be said that the affiant officer "should have *known* that his affidavit failed to establish probable cause (and hence that he should not have sought a warrant)." (*Ibid*.)

In this case, Detective Aguilera and other officers conducted an investigation and interviewed multiple individuals whose statements corresponded in a number of significant respects. The affidavits presented to the magistrate were not wholly conclusory and "bare bones." (See *Gates*, *supra*, 462 U.S. at p. 239.) "[T]houghtful and competent judges" might have disagreed "as to the existence of probable cause" (*Leon*,

18

*supra*, 468 U.S. at p. 926) to search defendant's residence and person. We cannot say that the affidavits were so lacking in the indicia of probable cause that it would be entirely *unreasonable* for a well-trained officer to believe they provided a basis for determining that probable cause existed.

*People v. Gotfried* (2003) 107 Cal.App.4th 254, (*Gottfried*) , which is cited by defendant, is distinguishable. In that case, a deputy sheriff's affidavit indicated that he had received an uncorroborated tip from an anonymous informant that the defendant was growing marijuana in his mobile home where he lived and selling it, but the affidavit did not establish "the veracity or basis of knowledge of the anonymous informant." (*Id.* at p. 264.) The deputy sheriff corroborated only the defendant's residence and vehicles. (*Ibid.*) This court concluded that the challenged search warrant, which authorized law enforcement to use a thermal imaging device to scan the defendant's residence, was not supported by probable cause since " '[a]ny rookie officer knows uncorroborated, unknown tipsters cannot provide probable cause for an arrest or search warrant.' [Citation.]" (*Id.* at p. 265.) In this case, the source of the affiant's information was not a single, uncorroborated anonymous informant.

Unlike the affidavit in *Gottfried*, Detective Aguilera's affidavits presented evidence that was "sufficient to make the probable cause determination a close question for any objectively reasonable and well-trained officer." (*Camarella*, *supra*, 54 Cal.3d at p. 606.) The detective acted reasonably by seeking search warrants based on her affidavits, and her reliance on the subsequently issued warrants was objectively reasonable. The good faith exception to the exclusionary rule applied.

DISPOSITION

The judgment is affirmed.

19

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.



_____

MIHARA, J.



*The People v. Mendoza*
H042044