NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0308n.06

Case No. 20-1535

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED
Jul 01, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellant,* | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| CHRISTOPHER CHARLES HOUGHTON, | ) | WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| *Defendant-Appellee.* | ) | |
| | ) | |

BEFORE:    WHITE, LARSEN, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. This case is about whether to suppress evidence the police found while searching Christopher Houghton's residence with a warrant. An informant known here as "AMJ," who had been recently released from jail, provided police with the bulk of the information used to secure the warrant. The district court suppressed the evidence, holding that the warrant lacked probable cause and that the good-faith exception to the exclusionary rule did not apply. Because the good-faith exception applies, we **REVERSE**.

## I.

AMJ had only been out of jail for one day when officers stopped him in Ingham County, Michigan. He was riding a moped with a stolen registration sticker and

carrying a pneumatic pistol with the orange ring on the tip removed. AMJ said that Houghton had given him the moped, and he offered to help the police by telling them about criminal activity involving Houghton.

AMJ told Deputy Torok that he had lived in Houghton's shed before his arrest and returned there after he was released from custody. He recounted that Houghton had said he was planning to steal from a certain propped-open shed, that Houghton and MD had stolen a work truck with Snap-On tools, and that Houghton had stolen certain things from two particular addresses (which Houghton pointed out to AMJ on a driving tour). And AMJ shared his own observations of Houghton. Houghton had gotten several new tools—which AMJ named by type and brand—as well as a "crotch rocket," a yellow mini-bike's frame, and a bike lift. He also said that when he met with Houghton at 1:30 a.m.,[1] Houghton was unloading more tools from his vehicle, including Snap-On wrenches, and sending pictures to JF, a co-conspirator. Finally, he noted that Houghton usually splits stolen property with MD, another co-conspirator, and they sometimes store stolen property in a certain vacant residence.

Deputy Torok found the shed AMJ referenced, and the owner confirmed that the door was open and the lock missing. Officers also surveilled JF's house and saw Houghton in the driveway. He was looking into a trailer, which he then towed away with his truck. An officer also stopped Houghton, but the only information he got was that Houghton was leaving JF's residence and going to his own.

---

[1] The district court judge said that the affidavit does not clarify whether it is in the morning or afternoon, but the time is written in military time, "0130hr," so it was most likely 1:30 a.m.

Detective Lo filed for a search warrant based on this information and his training and experience. The affidavit alleged:

4. Affiant was assigned to assist in an investigation that began with a traffic stop that occurred on 12/25/2019. DEP. TOROK [stopped AMJ] for riding on a moped with a stolen registration sticker and in possession of a pneumatic pistol with the orange ring taken off the barrel.

5. . . . [I]n DEP. TOROKS' investigation he learned from [AMJ] that he received the moped from a CHRISTOPHER HOUGHTON who resides in Delhi Manor [address].

6. . . . [AMJ] advised he was released from jail the morning of 12/24/2019 and walked to HOUGHTON'S residence in Delhi Manor, where he previously lived out of the shed. [AMJ] states in the 28 days he was in jail, HOUGHTON acquired some new tools and recalled seeing the following items:
> a. blue/black crotch rocket (no handles/gauges)
> b. frame to a yellow mini bike
> c. bike lift
> d. Porter Cable circular saw
> e. Porter Cable drill
> f. Craftsman drill

7. . . . [AMJ] also tells DEP. TOROK that while meeting with HOUGHTON, HOUGHTON drove [AMJ] around the area of Keller Ridge subdivision, where HOUGHTON talks about a shed near Keller/Sapling where he had already been, and left the door propped open and planned on returning to break into at a later time. DEP. TOROK was able to confirm the address to be [address], where the owner confirms the door on his shed to be slightly open and the lock on the door to be missing.

8. . . . [AMJ] also points out (2) two address [sic] on Knotwood Dr in Delhi Twp., to DEP. TOROK, where HOUGHTON advised to [AMJ] he recently stole from, each time using his uncle's truck. [Gives the addresses from which the mini-bike and the camper were stolen]

9. . . . [AMJ] tells DEP. TOROK, about HOUGHTON stealing a work truck with [MD] that had a bunch of Snap-On tools . . . [AMJ] continues to advise DEP. TOROK that he meets up with HOUGHTON at approximately 0130hr on 12/25/2019 where he observed HOUGHTON unloading tools from his vehicle and describes the tools as Snap On wrenches, impact sockets, router bits, red impact drill, "a big red motor."

10. . . . [AMJ] also tells DEP. TOROK that HOUGHTON began taking pictures of the tools and sending them to [JF] . . . who resides at [address].

11. . . . DEP. TOROK advised [AMJ] states HOUGHTON will usually split up the stolen property with [MD] . . . who resides at [address].

12. . . . DEP. TOROK was also advised by [AMJ] that HOUGHTON, [JF], and [MD] have also been using the property of [Coolridge Ave. address] to store stolen property as well. [AMJ] advises [that the property] is directly south of [JF's] residence, and is currently vacant.

13. . . . [O]n the morning of 12/26/2019, SGT. EVERY of the Ingham County Sheriff's Office, was conducting surveillance on [JF's] residence, when he observed HOUGHTON in the driveway of [address], where he appeared to be looking in an enclosed trailer, then left the residence in a vehicle with that trailer attached.

14. . . . SGT. EVERY was able to follow HOUGHTON from [JF's] residence to the entrance of Delhi Manor, where HOUGHTON was subsequently traffic stopped by DEP. DULING of the Ingham County Sheriff's Office and identified HOUGHTON as the driver of the vehicle.

15. . . . HOUGHTON tells DEP. DULING that he left [JF's] residence on Coolridge Ave. and was enroute to his residence in Delhi Manor . . . .

16. Affiant knows from his training and experience that individuals who steal property will usually conceal that stolen property in an area where they have direct control and access to, an area such as their residence, or their co-conspirator's residence.

17. Affiant also knows from his training and experience that when the stolen items such as handheld tools, can be concealed and stored in just about any open spaces such as sheds, desk drawers, vehicles and their compartments, and almost any other space that has a void that can hold items.

(R. 17-1, Search Warrant, PageID 45–46.) The state magistrate found probable cause to search Houghton's residence and issued a warrant. Executing the warrant, officers found a Snap-On tool, a pipe bomb. and copious ammunition. Based on this information, a federal grand jury in the Western District of Michigan indicted

Houghton for possession of an unregistered firearm (the pipe bomb) and being a convicted felon in possession of ammunition.

Houghton moved to suppress the evidence from the search, arguing that the warrant was not supported by probable cause and that no reasonable officer would have relied on the warrant. The district court granted the motion, finding the affidavit insufficient to establish probable cause. The court also found that a reasonable officer would not have relied on the warrant, making the good-faith exception inapplicable. The government appealed the order under 18 U.S.C. § 3731.

**II.**

The familiar Fourth Amendment standard drives this case: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrantless search is "presumptively unreasonable." *United States v. Karo*, 468 U.S. 705, 717 (1984).

But a search with a warrant is not necessarily constitutional. Every warrant must stand on probable cause—the factual inference of a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). If a magistrate lacks probable cause, the warrant he issues is unconstitutional, and the court may apply the exclusionary rule to suppress the evidence found in the resulting search. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).

But the exclusionary rule is subject to exceptions, including the good-faith exception. When officers obtain evidence in "objectively reasonable reliance on a subsequently invalidated search warrant," courts should not exclude the evidence. *United States v. Leon*, 468 U.S. 897, 922 (1984). This exception requires that the officer had "reasonable grounds for believing that the warrant was properly issued." *Id.* at 923. The standard for good faith is lower than the standard for probable cause. So even when an affidavit lacks probable cause, officers can sometimes rely on the good-faith exception. *See, e.g.*, *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017); *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

Yet good-faith reliance has boundaries. Officers do not get the benefit of the good-faith exception when the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.*[2] That kind of affidavit is called a "bare bones" affidavit. Bare-bones affidavits provide "nothing more than a mere guess that contraband or evidence of a crime would be found, either completely devoid of facts to support the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless." *United States v. Hines*, 885 F.3d 919, 927 (6th Cir. 2018) (quoting *White*, 874 F.3d at 496). The classic example is

---

[2] The Supreme Court has named four circumstances when the good faith exception should not apply. The first is when the affidavit contains information the officer knows or should know to be false. *Leon*, 468 U.S. at 923. The second is when "the issuing magistrate wholly abandoned his judicial role." *Id.* (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)). The third is the lack of indicia of probable cause. And the fourth is when the warrant facially lacks necessary elements like "the place to be searched or the things to be seized." *Id.* The only one at issue here is the third.

*Nathanson v. United States*, 290 U.S. 41 (1933). There, the officer affirmed only that he had "cause to suspect and d[id] believe that certain . . . liquors of foreign origin a more particular description of which cannot be given . . . brought into the United States contrary to law . . . [were] within the premises of J. J. Nathanson . . . at 117 No. Bartram Ave." *Id*. at 44; *see United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000).

Frequently, important features in probable-cause determinations are independent determination, informant credibility, and the nexus between the crime and the place to be searched. The Fourth Amendment requires that the inference of probable cause "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). And that requires that the affidavit have enough information for the magistrate to draw an "independent determination of probable cause" without relying on the officer's beliefs and inferences. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). There also must be a "substantial basis for crediting" any hearsay information, such as an informant tip, that the officer includes in the affidavit. *United States v. Meeks*, 313 F.2d 464, 465 (6th Cir. 1963). Finally, the affidavit's facts must establish a sufficient "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998) (citation omitted).

These factors are only part of the totality of the circumstances, and we look at the affidavit in a "commonsense" and not "hypertechnical" manner, considering the

"totality of the circumstances" rather than "engaging in line-by-line scrutiny." *Woosley*, 361 F.3d at 926. We also "give great deference to a magistrate's determination of probable cause," reversing only "if the magistrate arbitrarily exercised his or her authority." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013).[3]

## III.

The government argues that the totality of the circumstances supports a finding of probable cause. It notes that AMJ was a named informant with recently-gained, detailed, firsthand knowledge of criminal conduct—much like the informant in *United States v. Pelham*, 801 F.2d 875, 876 (6th Cir. 1986). Houghton responds that the affidavit did not establish AMJ's credibility, meaning that the officers would need to thoroughly corroborate his statements before relying on them, something he argues they did not do. He cites *United States v. Allen*, which noted that in "the absence of any indicia of the informants' reliability," courts have required "substantial independent police corroboration." 211 F.3d 970, 976 (6th Cir. 2000).

But Houghton confuses the standard for anonymous informants with the standard for named informants. The tip without "any indicia" of reliability in *Allen* was an "anonymous tip" with either little detail or only innocent detail. *Id.* Named informants' statements get "far greater weight than those of an anonymous source." *United States v. May*, 399 F.3d 817, 825 (6th Cir. 2005). As a named informant, AMJ's

---

[3] We review the district court's factual findings for clear error and the legal conclusions de novo. *See Brown*, 732 F.3d at 572. Whether an affidavit supports probable cause is a legal conclusion, so we do not defer to the district court. *Id.*

testimony should be analyzed using the typical measures of reliability, including basis of knowledge, detail, recency, and independent corroboration.[4] And "while better investigative work is preferable to merely adequate investigation, it is not the constitutional measure of probable cause." *Allen*, 211 F.3d at 976.

In the end, though, we need not decide the probable-cause question because the good-faith exception applies. In considering the exception, the district court misapplied the good-faith standard. Although it correctly stated that a bare-bones affidavit is not simply one that lacks probable cause, the district court focused solely on whether the affidavit lacked probable cause and offered almost no analysis specific to the good-faith exception. It stated:

> [W]e must take care not to confuse a bare bones affidavit with one that merely lacks probable cause. And here I think we have an affidavit that clearly lacks probable cause. And for the same reasons I think, as I have

---

[4] Spelling out the basis of knowledge ensures that the magistrate knows that the informant "is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *United States v. Pena*, 188 F.3d 509, 1999 WL 618082, at \*5 (6th Cir. 1999) (table) (citation omitted). A "close relationship" with the suspect can provide "a solid basis of knowledge from which to speak" about the suspect's crimes. *Wolfe v. Perry*, 412 F.3d 707, 718 (6th Cir. 2005).

Details—such as specifics on the crime and location—boost the credibility of the tip. *See Woosley*, 361 F.3d at 927. And recency is necessary for a proper warrant affidavit. If information is stale, it cannot support probable cause. *United States v. Perry*, 864 F.3d 412, 414 (6th Cir. 2017).

Police corroboration can come in different forms, including additional tips from others, the prior criminal history of the suspect, surveillance, trash pulls yielding evidence, and controlled drug purchases. "When it comes to probable cause, 'the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation.'" *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)). Even a small corroborative fact insufficient on its own can be "a relevant data point in the 'totality of the circumstances' constellation, rather than an independent thing to be lined up and shot down one by one." *Id.*

indicated, that a reasonable, careful Magistrate and a reasonable law enforcement officer would not in good faith rely on this affidavit.

(R. 31, Dist. Ct. Op., PageID 183.) "We reserve [the bare-bones] label for an affidavit that merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *Christian*, 925 F.3d at 312 (quoting *Washington*, 380 F.3d at 241 n.4). The "affidavit must be 'so lacking in indicia of probable cause' as to make an officer's 'belief in its existence [ ] objectively unreasonable.'" *Id.* (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

Correct application of that test shows that the good-faith exception applied. The affidavit contained "factual allegations, not just suspicions or conclusions." *Id.* at 313. In over a dozen paragraphs, the affidavit explained why the officers believed they would find evidence at Houghton's residence. The affidavit included AMJ's statements about the exact brands and types of tools that Houghton possessed and specific addresses of places where Houghton had allegedly stolen from—along with an address where police confirmed with the owner that a shed-door had been propped open, as AMJ said it was. AMJ also provided the names and addresses of potential accomplices, and police saw Houghton arrive at the home of one of those alleged accomplices the next day. All of that supported AMJ's veracity, reliability, and basis of knowledge. We cannot fairly characterize the affidavit's allegations as a "mere guess." *Hines*, 885 F.3d at 927 (quoting *White*, 874 F.3d at 496).

And the officers had the nexus required for the good-faith exception to apply: a "minimally sufficient nexus between the illegal activity and the place to be

searched." *White*, 874 F.3d at 497.[5] While the affidavit did not specifically say that AMJ saw stolen property at Houghton's house, paragraph six implies that AMJ was at Houghton's residence when he saw the new tools that Houghton had obtained since AMJ was last there. AMJ also said he saw Houghton unloading tools from his truck at 1:30am—including Snap-On wrenches—and said that Houghton had previously stolen a work truck with Snap-On tools. AMJ said that Houghton was texting photos of these tools, at 1:30am, to one of his alleged co-conspirators. These actions took place at Houghton's residence. Also supporting a search of Houghton's residence is the officer's experience that thieves often store their wares in their own or a co-conspirator's residence. We have held that "an officer's 'training and experience' may be considered in determining probable cause." *Schultz*, 14 F.3d at 1097. Taken together, the facts in the affidavit pass the good-faith threshold.

## IV.

Because the district court should have applied the good-faith exception, we **REVERSE** the district court's grant of the motion to suppress and **REMAND** for proceedings consistent with this opinion.

---

[5] In *United States v. Schultz*, the court held that, although statements about the officer's "training and experience" were insufficient for the probable-cause nexus, it "was not so remote" a connection "as to trip on the 'so lacking' hurdle" of the good faith standard. 14 F.3d 1093, 1098 (6th Cir. 1994). And pathways between a marijuana field and a house that failed to show probable cause in *United States v. Carpenter* still supported applying the good-faith exception. 360 F.3d 591, 598 (6th Cir. 2004).